**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOREN LAMONTE' QUALLS,<br><br>   Plaintiff,<br><br>   v.<br><br>REGENTS, UNIVERSITY OF CALIFORNIA, UNIVERSITY OF CALIFORNIA-MERCED, SCHOOL OF THE HUMANITIES, MERRITT WRITING PROGRAM,<br><br>   Defendant. | Case No. 1:13-cv-00649-LJO-SMS<br><br>ORDER DISMISSING PLAINTIFF'S COMPLAINT WITH LEAVE TO AMEND<br><br>(Doc. 1) |

**Screening Order**

Plaintiff Loren L. Qualls ("Plaintiff") filed a complaint on May 3, 2013. Doc 1. The caption of the complaint identifies a single "Defendant," denominated as REGENTS, UNIVERSITY OF CALIFORNIA, UNIVERSITY OF CALIFORNIA-MERCED, SCHOOL OF THE HUMANITIES, MERRITT WRITING PROGRAM, referred to thereafter as UC Merced, "UCM," or "Defendant."[1]

As explained below, the Court dismisses the complaint. Plaintiff may amend certain claims; others are dismissed without leave to amend.

**I.   Screening Requirement**

The Court must screen complaints filed by plaintiffs proceeding *in forma pauperis*. 28 U.S.C § 1915(e)(2); *Lopez v. Smith*, 203 F.3d 1122, 1129 (9th Cir. 2000) ("applies to all *in forma pauperis*

---

[1] Plaintiff has also included a "proof of service" which purports to serve two defendants, and in the body of his complaint he names additional defendants. If Plaintiff wishes to identify more than one defendant, then his caption may use the plural word "defendants" and must be clear as to their identities or designate them as "Doe" when their identities are not known. Also, he must refer to each defendant in the header of each applicable cause of action, followed by supporting facts against each defendant in the body of the cause of action.

1

complaints"). This procedure is cumulative of, and not a substitute for, any subsequent Rule 12(b)(6) motion that the defendant may choose to bring. *Teahan v. Wilhelm*, 481 F. Supp. 2d 1120 (S.D. Cal. 2007). The Court must dismiss a complaint, or portion of the complaint, if it is "frivolous or malicious," "fails to state a claim upon which relief may be granted," or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

A complaint is frivolous "when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992). A complaint is malicious if not pled in good faith. *Kinney v. Plymouth Rock Squab. Co.*, 236 U.S. 43, 46 (1915). A complaint's failure to state a claim is defined in Fed.R.Civ.P. 12(b)(6), in that it does not satisfy the pleading standards in Fed.R.Civ.P. 8. *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010).

## II.  Pleading Standards

Under Fed. R. Civ. P. 8(a), a pleading that states a claim for a relief must include a statement demonstrating the Court's jurisdiction, "a short and plain statement of the claim showing the pleader is entitled to relief; and . . . a demand for the relief sought, which may include relief in the alternative or different types of relief." It must give the defendant fair notice of the claims against him and state their elements plainly and succinctly. *Jones v. Cmty. Redevelopment Agency*, 733 F.2d 646, 649 (9th Cir. 1984); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). The Supreme Court noted,

> The pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement. … [¶] [A] complaint must contain sufficient factual matter, accepted as true, to … allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). Although a court assumes the truth of well-pled factual allegations, legal conclusions are not entitled to the same assumption of truth. *Id.*

If the Court determines that the complaint fails to state a cognizable claim, the Court may grant leave to amend to the extent the deficiencies can be cured. *Lopez v. Smith*, 203 F.3d 1122, 1127-28 (9th Cir. 2000) (en banc) (the "rule favoring liberality in amendments to pleadings is

particularly important for the *pro se* litigant") (*quoting Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir.1987)). Only if it is "absolutely clear" that the deficiencies could not be cured by amendment should the Court dismiss a *pro se* complaint with prejudice. *Noll* at 1448.

### III.  Factual Allegations

Plaintiff, a male of African American ancestry, entered into a written employment contract with Defendant on January 1, 2008. In his contract, he was appointed to the position of Lecturer at UCM's Merritt Writing Program. He also participated in various committees and was Grievance Chair in his union, the American Federation of Teachers. The contract was for employment through June 30, 2011, and guaranteed reappointment unless "for cause: breach of MOU."

During his employment, he performed his responsibilities as Lecturer in an exemplary fashion, received favorable performance reviews or evaluations, and otherwise performed each and every condition of his written employment agreement. These positive reviews communicated to him a promise of job security, which he believed and relied upon.

Also throughout his employment, Plaintiff was subject to "continuous harassment and negligence." This treatment started soon after his appointment. On January 7, 2008, he was first introduced to the staff and faculty of the Merritt Writing Program. His impression was that he was greeted with "ostracism, disquiet, and overall disappointment he was not a woman and is African American." This impression was reinforced by "staff apologies for emails that had referred to Plaintiff as a woman." (The Court notes that Plaintiff's first name is "Loren.") These apologies referenced the fact that all interviews were conducted via phone. Due to his poor initial reception and his colleagues' references to the phone interviews, Plaintiff states that "Defendant implied they had no idea" he was a black male.

Two-and-a-half weeks later, the IT administrator referred to Plaintiff as the "sole member of 'BFA' (Black Faculty Association) as a joke." Plaintiff explains that this comment was the first he learned that he was the only African American faculty member on campus. (It is unclear whether Plaintiff also presents this experience as an example of hostile conduct, since he characterizes the speaker as making "a joke" and states only that the comment informed him about the number of other African American faculty members on campus.) Plaintiff adds that "[s]ubsequently during

1 faculty meetings the Plaintiff would be referred to as 'Snoop-Dog' and or 'Jay-Z' or the guy with
2 hair like burnt 'cheetos.'"

3 Over the next two years, Plaintiff found that his contributions to various programs,
4 committees, initiatives, and grant writing opportunities were "ignored, misrepresented, and/or
5 completely denied." This caused him to feel excluded and shunned, and to feel depressed and
6 despondent. Due to these feelings, he began withdrawing from institutional activities which were not
7 "contracted responsibilities" for the Lecturer bargaining unit according to the Memorandum of
8 Understanding of his union.

9 A conflict arose over Plaintiff's decision not to attend certain meetings. During an
10 unspecified four-month period, Plaintiff missed three CoreOne meetings, and called into a fourth
11 meeting by conference call. Defendant would later tell the EEOC that it had fired Plaintiff in part
12 because he failed to attend these mandatory meetings. However, Plaintiff states that attendance at
13 those meetings was not required under his union's MOU, and that he never received an emailed
14 warning from his supervisor; rather, anyone who missed any meetings in CoreOne received a
15 "general email" sent by Tom Hothem, who was a lecturer, not a supervisor. At least four other
16 lecturers entirely failed to attend any meetings, all Caucasian; they all received the same email, but
17 suffered no reprimand and were all reappointed.

18 Plaintiff states that the "harassment and negligence" intensified starting around the same time
19 as the conclusion of a certification of UC Merced by the Western Association of Schools and
20 Colleges (WASC), an accrediting organization. This occurred in July 2010, ten months before
21 Plaintiff learned he would not be reappointed.[2] WASC's accreditation included a review of minority
22 faculty appointment. Plaintiff suggests that he was retained in part for the purpose of influencing this
23 review, and/or that he was terminated in part because the review was complete. However, read
24 literally, the complaint merely points out the coincidence without asserting the connection.

25 One ongoing problem had its origins in June 2010, the month before WASC finished its
26 accreditation: the eight-foot glass wall panel in Plaintiff's office shattered, rendering Plaintiff's
27 office unsafe to use. Plaintiff states that although he immediately informed his supervisor, Robert

28
---
[2] The complaint also says, inconsistently, that the accreditation ended in July 2011.

4

Oschner, Plaintiff's office was not repaired and made usable until June 2011, a full year later, two weeks after Plaintiff learned that he would not be reappointed. During this period he was forced to work outside his office for personal safety.

Another incident occurred in December 2010 and January 2011. Plaintiff approached Mr. Oschner, the director of the writing program, for help in obtaining a grant. Lecturers at UCM are encouraged to write grants, yet they need a supervisor to sign off as the "Primary Investigators" on their grants; Mr. Oschner offered to perform this role with Plaintiff's grant, as he typically did for Plaintiff's colleagues. Plaintiff submitted a draft. Mr. Oschner returned this with changes and said that with these changes, the grant would be ready to submit. Plaintiff submitted the revised grant to Mr. Oschner. When he returned from winter break, Mr. Oschner told Plaintiff that he had missed the grant deadline. When Plaintiff told Mr. Oschner that he had sent him the changes by the deadline, Mr. Oschner "became enraged, said 'they would not give me the money.'" Later than month, Mr. Oschner informed Plaintiff that he had pulled the grant from the review committee because it would not serve UCM. He added, "You just can't seem to find a niche for yourself at UCM."

In another incident, Plaintiff approached Mr. Oschner and suggested two diversity-focused proposals involving the University's "Historically Black College and Universities Initiative." Mr. Oschner declined, stating he had no interest in "that type of scholarship." Plaintiff then asked about the repair of his office window. Plaintiff explained that he was prevented from using his office for student conferences and that it seemed Mr. Oschner was trying to force him out by making it difficult to work. Mr. Oschner responded that the repairs "could be arranged," but he did not have time to worry about it because he was tied up in completing the WASC accreditation process.

On May 25, 2011 Plaintiff received an email from Mr. Oschner stating that reappointments would be postponed due to a $600,000 budgetary shortfall, which represented ten lecturer salaries. On May 30, 2011, Plaintiff received an email that he would not be reappointed, followed by a third email explaining that his portfolio had been insufficient. Plaintiff states, however, that he received a three out of four on his "evaluative portfolio." Although it is unclear what this score means, Plaintiff adds that he had never before heard any mention about weakness in his portfolio.

On June 10, 2011, Plaintiff learned from his union that the budget crisis was "unfounded," that the ten lecturers had been "misl[e]d," and that the other nine lecturers had been offered the opportunity to return to various positions at UCM, including in the Merritt Writing Program. Plaintiff, however, was not invited to return. Plaintiff adds that the other nine lecturers were Caucasian, that all new hires in the writing program were Caucasian, and that there are currently no African Americans working for the writing program. On August 27, 2011, Plaintiff emailed his supervisor and asked to return to the writing program. He received no response.

Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC). On February 4, 2013, the EEOC provided a brief summary of its investigation.[3] The EEOC also provided a Right to Sue letter dated February 5, 2013. Plaintiff filed a complaint on May 3, 2013.

**IV.    Analysis**

    **A.    Breach of Contract**

Plaintiff's first cause of action alleges breach of an express employment agreement by UCM and "DOES 1 through 22." (However, the Doe defendants do not appear in the caption of the case or in the header of the claim.) To state a cause of action for breach of contract in California, a plaintiff must plead the contract, his performance of the contract or excuse for non-performance, defendants' breach, and the resulting damage. *Lortz v. Connell* 273 Cal.App.2d 286, 290 (1969).

However, it is "well settled in California that public employment is not held by contract but by statute and that, insofar as the duration of such employment is concerned, no employee has a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law." *Miller v. State of California*, 18 Cal.3d 808, 813 (1977). As a result, civil service and noncivil service public employees alike cannot state a cause of action for breach of contract or breach of the implied covenant of good faith and fair dealing. *Shoemaker v. Myers*, 52 Cal.3d 1, 23-24 (1990); *Hill v. City of Long Beach*, 33 Cal.App.4th 1684, 1690 (1995). Instead, remedies are limited to those provided by statute or ordinance. *Hill v. City of Long Beach*, 33 Cal.App.4th 1684, 1690 (1995). This principle applies to employees of the University of California.

---

[3] This letter also contains several handwritten interlineations, but the Court cannot confirm who wrote these. If Plaintiff intends these notations to function as factual allegations, he should include them in his amended complaint.

*Kim v. Regents of the University of California*, 80 Cal.App.4th 160, 165 (2000); *see also Smith v. Regents of Univ. of California*, 2003 WL 2008215 (Cal. Ct. App. May 1, 2003) (unpublished). Nor does membership in a labor organization or protection under an MOU alter Plaintiff's status as a public employee, or alter the fact that "[the] terms and conditions of civil service employment are fixed by statute and not by contract." Government Code Section 18500, *et seq*.

Because Plaintiff alleges that he was an employee of the University of California, his claim for breach of contract is not cognizable. Since amendment will not remedy this problem, this claim should be omitted from the complaint in the future, should Plaintiff choose to amend.

### B. Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges breach of an implied-in-fact contract and breach of the implied covenant of good faith and fair dealing by Defendant UCM. Plaintiff alleges that when he and Defendant entered into his employment contract, they entered into an implied-in-fact contract whose terms included: (1) Plaintiff could continue his employment indefinitely if he carried out his duties properly and confidently; (2) he would not be demoted or disciplined for other than good cause and notice and the ability to improve; (3) Defendant would not evaluate his performance arbitrarily; (4) Defendant would provide him with support so he could carry out his responsibilities. Plaintiff alleges that he met these conditions. Plaintiff then invokes the covenant of good faith and fair dealing as follows: "Said covenant of good faith and fair dealing inheres in every contract and in particular is implied in the terms of Plaintiff's written employment agreement (MOU) with Defendant UCM." Plaintiff alleges that Defendant breached that covenant.

"Since the good faith covenant is an implied term of a contract, the existence of a contractual relationship is thus a prerequisite for any action for breach of the covenant." *Kim v. Regents of the University of California*, Cal.App.4th 160, 164 (2000) (citing *Smith v. City and County of San Francisco*, Cal.App.3d 38, 49 (1990)); *see Lachtman v. Regents of the University of California*, 158 Cal.App.4th 187, 207 (2007) (California public employees cannot state cause of action for breach of implied covenant of good faith and fair dealing arising out of the public employment relationship). Again, because Plaintiff alleges that he was an employee of the University of California, this claim is not cognizable and should be omitted should Plaintiff choose to amend his complaint.

7

## C. **Defamation**

Plaintiff's next cause of action[4] alleges defamation by Defendant UCM and "Does 1 [through] 9." Defendants, acting within the course of their employment, made untrue statements to Plaintiff's co-employees as well as to the EEOC alleging, among other things, that he was not reappointed due to "work performance" and "misrepresentation of supervisor on grant application." These statements were published with malice (by Defendant UCM only) to harm Plaintiff's good name, injuring him.

To state a claim for defamation, Plaintiff must show the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage. *Smith v. Maldonado,* 72 Cal.App.4th 637 (1999). Defamation may be any publication which would "tend to injure [the] person in his or her business or profession, or otherwise cause actual damage." *Rothman v. Jackson,* 49 Cal.App.4th 1134, 1140 (1996).

A complaint for defamation is defective if it "does not allege either the specific words or the substance of [the] statements ... but instead merely alleges the conclusions of the pleader that statements were made which 'intimated and suggested' that plaintiff had done certain wrongful things." *Lipman v. Brisbane Elementary Sch. Dist.*, 55 Cal.2d 224, 235 (1961) (overruled other grounds in *Brown v. Kelly Broadcasting Co.*, 48 Cal.3d 711, 753 (1989)). Plaintiff does not meet this requirement. His allegation that unnamed "defendants" made statements to co-employees and to the EEOC that he was not reappointed due to "work performance" is not specific enough. Furthermore, it is unclear what Plaintiff means by the phrase "misrepresentation of supervisor on grant application." The complaint does not identify misrepresentations that Mr. Oschner made on the grant application itself; instead, it identifies misrepresentations that Mr. Oschner made to Plaintiff regarding his grant application. Statements made solely to Plaintiff would not be a "publication" for purposes of a defamation claim. Thus, it is not clear how or whether the grant-writing incident became a matter of defamation.

---

[4] The complaint jumps from the second to the sixth cause of action. The Court questions whether the complaint is complete or whether Plaintiff intended to allege additional causes of action.

8

Furthermore, Defendant initially states this claim against UCM and "Does 1 [through] 9," yet he only alleges specific actions by UCM. If Plaintiff wishes to include other defendants in this charge, he must allege actions by them.

### D. Employment Discrimination (Title VII)

Plaintiff's next cause of action is against Defendant UCM and "Does 1-22." It is for discrimination on the basis of race and ethnicity under Title VII of the Civil Rights Act. Plaintiff filed a complaint with the EEOC sometime in 2011 (the exact date does not appear in the complaint) and received his right-to-sue letter. Section 703(a) (1) of Title VII provides that it is "an unlawful employment practice" for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). It is the employer, and not individual employees, who can be held liable for damages under Title VII. *Miller v. Maxwell's Intern. Inc.,* 991 F.2d 583, 587 (9th Cir.1993).

To establish federal subject matter jurisdiction, a plaintiff must exhaust his administrative remedies by filing a timely charge with the EEOC, thereby allowing the agency time to investigate the charge. *See* 42 U.S.C. § 2000e-5(b); *Lyons v. England*, 307 F.3d 1092, 1103-04 (9th Cir. 2002). Plaintiff alleges that he has done this, and has enclosed his right-to-sue letter from the EEOC.

The complaint need not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); it need only contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 (2002). However, Plaintiff does not identify a theory of discrimination under Title VII. The Court considers two theories, hostile environment and wrongful termination.

### Hostile Work Environment

To state a prima facie hostile-work environment claim, Plaintiff must plead that (1) the defendants subjected him to verbal or physical conduct based on his protected status; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. *Surrell v. California Water Service Co.,* 518 F.3d 1097, 1108 (9th Cir.2008); *Brooks v. City of San Mateo,* 229 F.3d 917, 923 (9th

9

1  Cir.2000). Plaintiff alleges that he is African-American and a member of a protected class, and
2  describes the following conduct.

3        The first two events are not described as unwelcome conduct based on Plaintiff's race. On
4  Plaintiff's first day of work, had the impression that he was welcomed with "ostracism, disquiet, and
5  overall disappointment" that he was not a woman and was black, but according to the complaint he
6  based this impression on his colleagues' apologies for assuming he was female. Next, Plaintiff
7  describes an interaction from which he learned that he was the only black faculty member, but (as
8  explained above) it is unclear whether Plaintiff perceived the interaction as unwelcome. Subsequent
9  conduct was clearly unwelcome and based on his race: "[D]uring faculty meetings the Plaintiff
10  would be referred to as 'Snoop-Dog' and or 'Jay-Z' or the guy with hair like burnt 'cheetos.'"

11        As for much of the remaining conduct, Plaintiff describes this as unwelcome and altering the
12  work environment, but the connection to Plaintiff's race or ethnicity rests upon Plaintiff's allegation
13  only. He states that his contributions to various programs, committees, initiatives, and grant writing
14  opportunities were ignored, misrepresented, or completely denied. Beginning in June 2010 his office
15  was made unusable and not repaired, sending Plaintiff the message that he was unwelcome. His
16  supervisor did nothing about it; when told about the issue apparently for the second time, sometime
17  after January 2011, the supervisor said he was too busy to handle it himself because he was involved
18  in the WASC certification. On another occasion, this same supervisor misled Plaintiff about a grant,
19  first stating that Plaintiff had missed the deadline and later admitting that he had pulled the grant
20  from the review committee because it would not serve UCM; he added, "You just can't seem to find
21  a niche for yourself at UCM." Later, the same supervisor declined to support two proposals through
22  the "Historically Black College and Universities Initiative," stating he had no interest in "that type of
23  scholarship." It is unclear whether Plaintiff means to assert a connection to race here.

24        Later, Plaintiff and nine other writing lecturers were terminated, ostensibly because of a
25  budget shortfall. Plaintiff was also told that his failure to attend mandatory meetings was a factor in
26  his termination. However, the budgetary shortfall was revealed to be a fiction, and the nine other
27  writing lecturers—all of whom were white—were hired back, including four who also failed to
28

attend meetings. Plaintiff had also been told that his portfolio had been insufficient, but he had never heard any mention of this before.

Based on these allegations, Plaintiff has satisfied the screening requirements for a hostile work environment claim.

**Wrongful Termination**

To state a prima facie wrongful termination claim, Plaintiff must plead that (1) he was a member of a protected class; (2) he was performing his job in a satisfactory manner; (3) he suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the protected class were treated more favorably. *Aragon v. Republic Silver State Disposal, Inc.,* 292 F.3d 654, 659 (9th Cir.2002).

Plaintiff alleges membership in a protected class. He also states he performed his job in a satisfactory manner; the "three out of four" for his portfolio was not substantiated in other feedback, and he performed his responsibilities in an "exemplary" fashion. He was terminated and, as summarized above, white employees who were also terminated later were hired back. Based on these allegations, Plaintiff has satisfied the screening requirements for a wrongful termination claim.

### E.   **Violation of First Amendment Rights**

Plaintiff's next cause of action, against "Defendant UCM 21-22" [sic], states that "Defendant UCM Merritt Writing Program" deliberately and intentionally violated his First Amendment Rights. Technically, the First Amendment only restricts actions by the federal government. First Amendment rights against state actors derive from the Fourteenth Amendment and must be brought under 42 U.S.C. § 1983. *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004); *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999).

To make a prima facie case under § 1983, the plaintiff must demonstrate that a person acting under color of law deprived him of a federal right. To state a claim against a government employer for violation of the First Amendment, a plaintiff must plead facts demonstrating: (1) he engaged in protected association or speech; (2) the employer took "adverse employment action" against him; and (3) his association or speech was a "substantial or motivating" factor for the adverse

employment action. *Bd. Of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996); *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003).

It is unclear whether Plaintiff has pled the first element—protected speech—because it is unclear what activities Plaintiff is referring to in this claim. As with his defamation claim, Plaintiff needs to be more clear about what speech he is referring to.

In addition, Plaintiff cannot plead a violation of the First Amendment against a California government entity. Under the Eleventh Amendment, the State of California and its official arms are immune from suit under 42 U.S.C. § 1983 in federal court. *See Howlett v. Rose,* 496 U.S. 356, 365 (1990). The University of California and the Board of Regents are considered to be instrumentalities of the state for purposes of the Eleventh Amendment. *See Jackson v. Hayakawa,* 682 F.2d 1344, 1350 (9th Cir.1982); *see also Hong v. Grant*, 403 F. App'x 236, 237 (9th Cir. 2010) (unpublished); 28 U.S.C. § 1915(e)(2)(B)(iii) ("the court shall dismiss the case at any time if the court determines that the action or appeal seeks monetary relief against a defendant who is immune from such relief").

In light of Eleventh Amendment immunity, Plaintiff cannot state a cognizable First Amendment claim against the University or the Board of Regents. Since amendment will not remedy this problem, this claim should be omitted should Plaintiff choose to amend the complaint.

### F. <u>Intentional Infliction of Emotional Distress</u>

Plaintiff's next cause of action, against "Defendant UCM and Does 1-22," alleges states that "Defendant UCM Merritt Writing Program, acting on their own and through agents and employees," engaged in acts amounting to intentional infliction of emotional distress ("IIED"). Specifically, Plaintiff was required to work under and in broken glass, lost his professional space to conduct business, and thereby suffered in productivity and was sent the message that "you are not wanted."

The elements of an IIED claim are: (1) defendant's outrageous conduct; (2) defendant's intention to cause, or reckless disregard of the probability of causing, emotional distress; (3) plaintiff's suffering severe or extreme emotional distress; and (4) an actual and proximate causal link between the tortious (outrageous) conduct and the emotional distress. *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 155, n. 7 (1987). To be "outrageous," the conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Davidson v. City*

*of Westminster*, 32 Cal.3d 197, 209 (1982) (quoting *Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 593 (1979)). Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 617 (1989). "Severe emotional distress" means "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Potter*, 6 Cal.4th at 1004. It means "highly unpleasant mental suffering or anguish 'from socially unacceptable conduct' . . . , which entails such intense, enduring and nontrivial emotional distress that 'no reasonable [person] in a civilized society should be expected to endure it.'" *Schild v. Rubin*, 232 Cal.App.3d 755, 762-763 (1991) (citations omitted).

To allege "outrageous" conduct, Plaintiff specifically points to Defendant's failure to repair the broken window in his office. This caused Plaintiff to lose professional space in which to conduct business, caused an adverse effect on his productivity, and caused the "emotional knowledge of knowing, 'you are not wanted.'" By themselves, these experiences would be "mere indignities." However, Plaintiff states that he also found himself "working under, and in broken glass." As to this point the complaint is contradictory. Plaintiff elsewhere states that he was "forced to work outside his office for personal safety." Because Plaintiff is ambiguous whether he actually had to work "under, and in broken glass," the Court will allow Plaintiff to amend this claim.

### G. Negligent Infliction of Emotional Distress

Plaintiff does not plead a claim for negligent infliction of emotional distress. However, he does include such a claim in the caption of his complaint. To the extent that Plaintiff intended to plead this claim, he may do so by amending his complaint. A claim for negligent infliction of emotional distress is pled as follows.

NIED is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply. *Huggins v. Longs Drug Stores California, Inc.*, 6 Cal.4th 124, 129 (1993). California law recognizes that "there is no independent tort of negligent infliction of emotional distress" in that "[t]he tort is negligence, a cause of action in which a duty to the plaintiff is an essential element." *Potter*, 6 Cal.4th at 984. The existence of a duty is a question of law. *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.,* 48 Cal.3d 583, 588 (1989). NIED includes

"at least two variants of the theory" – "bystander" cases and "direct victim" cases. *Wooden v. Raveling*, 61 Cal.App.4th 1035, 1037 (1998). A right to recover for emotional distress as a "direct victim" arises from the breach of a duty that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of the defendant's preexisting relationship with the plaintiff. *Burgess v. Superior Court*, 2 Cal.4th 1064, 1073-1074 (1992); *Marlene F.*, 48 Cal.3d at 590. In "direct victim" cases, "well-settled principles of negligence are invoked to determine whether all elements of a cause of action, including duty, are present in a given case." *Burgess*, 2 Cal.4th at 1073. "[U]nless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and emotional distress is proximately caused by that breach of duty." *Potter*, 6 Cal.4th at 985.

## V.     Conclusion

Plaintiff has pled a cognizable claim for Title VII discrimination. The Court dismisses, with prejudice, Plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of First Amendment rights by UCM. The Court dismisses, without prejudice, Plaintiff's claims for defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress.

If Plaintiff opts to amend, his amended complaint should meet the same requirements that applied to his previous complaint: it should be brief, but must state facts supporting allegations as to the harm caused by each defendant. Fed. R. Civ. P. 8(a); *Iqbal*, 129 S. Ct. at 1948-49. Although accepted as true, "[f]actual allegations must be [sufficient] to raise a right to relief above the speculative level . . . ." *Twombly*, 127 S. Ct. at 1965 (citations omitted). Plaintiff is advised that an amended complaint supersedes the original complaint. *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997); *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987). In addition, an amended complaint must be "complete in itself without reference to the prior or superseded pleading." Local Rule 220. Plaintiff is warned that "[a]ll causes of action alleged in an original complaint which are not alleged in an amended complaint are waived." *King*, 814 F.2d at 567, (citing *London v. Coopers & Lybrand*, 644 F2d 811, 814 (9th Cir. 1981)); *accord Forsyth*, 114 F.3d at 1474.

Accordingly, it is **HEREBY ORDERED** that:

1. Plaintiff's Complaint is **DISMISSED**, in part with prejudice and in part without prejudice;

2. Within **30 days** from the date of service of this order, Plaintiff must file an amended complaint curing the deficiencies identified by the Court in this order;

3. If Plaintiff fails to comply with this order, the action will be dismissed for failure to obey a court order.

IT IS SO ORDERED.

Dated:   **June 29, 2013**               **/s/ Sandra M. Snyder**
                                         UNITED STATES MAGISTRATE JUDGE