1

2

3

4

5

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

6

7

8

9

10

11

12

| | |
|---|---|
| **LOREN LAMONTE' QUALLS,** | **1:13-cv-00649-LJO-SMS** |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 46)[1]** |
| **v.** | |
| **REGENTS OF THE UNIVERSITY OF CALIFORNIA** *et al.*, | |
| **Defendants.** | |

13     Defendants Regents of the University of California ("the Regents"), Robert Ochsner, Tom

14   Hothem and Anne Zanzucchi (collectively, "Defendants") request summary adjudication on *pro se*

15   Plaintiff Loren Lamonte' Qualls's ("Plaintiff") claims of racial discrimination under Title VII of the

16   Civil Rights of 1964 (42 U.S.C. § 2000e *et seq.*) ("Title VII") and his claim of defamation under

17   California state law.  (Doc. 46).  Defendants Ochsner, Hothem, and Zanzucchi were at all relevant times

18   employees of the Regents.  (*Id.*)  Plaintiff failed to file an opposition in a timely manner.  (*See* Doc. 52).

19   The Court finds that the matter is suitable for decision on the papers pursuant to Local Rule 230(g).  For

20   the following reasons, the Court will grant in part and deny in part Defendants' Motion.

21                              **I. FACTUAL BACKGROUND**

22     This case arises out of Plaintiff's former employment at the University of California, Merced

23   ("UCM").  (Doc. 10).  Plaintiff is African American.  (Joint Statement of Undisputed Material Facts

24   _____

25   [1]Although this case was transferred on September 16, 2015 to Judge Dana L. Christensen for purposes of conducting trial, the
transfer order did not impact the undersigned's jurisdiction to adjudicate the pending motion.  (*See* Doc. 53.).

1  ("JSUMF") 2:1).  Plaintiff served a total of three limited-term appointments, from January 2008 to May

2  2011, as a lecturer at the Merritt Writing Program ("MWP"), an academic unit within UCM's School of

3  Social Sciences, Humanities, and Arts.  (Defs' Mot., Exh. B-3, DEF 0234-0244; Exh. B-6, DEF 0239-

4  0240; Exh. B-10, DEF 0251-0252).  Ochsner was the Co-Director of the MWP throughout the relevant

5  time period. (JSUMF 2:2; Defs' Mot., Exh. R, Declaration of Robert Ochsner ("Ochsner Decl."), ¶¶ 1,

6  2).  Ochsner recommended Plaintiff for employment in each term that Plaintiff served, and was also

7  Plaintiff's direct supervisor for each term.  (JSUMF 2:20; Ochsner Decl., ¶¶ 1, 2).

8         In November 2007, Ochsner conducted a telephonic interview of Plaintiff for a position at UCM.

9  (JSUMF 2:3; Ochsner Decl., ¶ 2).  Ochsner states that Plaintiff interviewed well.  (Ochsner Decl., ¶ 2).

10  Moreover, Ochsner was impressed by Plaintiff's experience teaching in Tunisia and American Samoa,

11  and by his experience teaching diverse students in the United States.  (*Id.*).  On December 4, 2007, UCM

12  issued an offer letter to Plaintiff for a lecturer position for the Spring 2008 semester, during which

13  period Plaintiff would teach three writing courses at the MWP.  (*Id.*).  This first appointment was for a

14  limited term, from January 1, 2008, through May 31, 2008, and was governed by a Memorandum of

15  Understanding ("MOU") between UCM and the American Federation of Teachers.  (JSUMF 2:7, 10;

16  Defs' Mot., Exh. B-3, DEF 0234-0235).

17  ***First Term (2008-2009 Academic Year)***

18         As a lecturer, Plaintiff was subject to classroom observation by MWP administrators to assess

19  his effectiveness as an instructor.  (Defendants' Statement of Undisputed Material Facts ("DUMF")

20  4:13.).  Zanzucchi, who at all relevant times was an Assistant Director of the MWP, regularly conducted

21  classroom observations of MWP instructors.  (Defs' Mot., Exh. T, Declaration of Anne Zanzucchi

22  ("Zanzucchi Decl."), ¶¶ 1, 2).   On March 3, 2008, during Plaintiff's first term at MWP, Zanzucchi

23  observed a session of one of Plaintiff's classes.  (DUMF 3:11; Zanzucchi Decl., ¶ 2; Ochsner Decl., ¶ 4).

24  During her visit, Zanzucchi observed that Plaintiff arrived over five minutes late, despite having notice

25  that she would be observing his class, and found Plaintiff's instruction to be "disorganized and

2

unfocused." (Zanzucchi Decl., ¶ 2).  According to Zanzucchi, Plaintiff "spent a considerable amount of class time showing YouTube clips that had little to do with the course material," and there was a "palpable lack of student participation and interaction throughout the class session." (*Id.*).  Based on what she observed, Zanzucchi "grew concerned about [Plaintiff's] effectiveness in providing fundamental aspects of instruction." (*Id.*).  Soon after her visit to Plaintiff's classroom, Zanzucchi drafted a report summarizing her observations and noting her concerns. (*Id.*; *see also* Def's Mot., Exh. F, DEF 0236 (true and correct copy of Zanzucchi's class visit report)).  In her report, Zanzucchi recommended a second visit to Plaintiff's classroom due to "fundamental" concerns with Plaintiff's teaching effectiveness.  (Def's Mot., Exh. F, DEF 0236).

Zanzucchi provided a copy of her report to Ochsner, who states that he "became aware of issues relating to [Plaintiff's] teaching performance" during Plaintiff's first term of employment.  (Ochsner Decl., ¶ 4.).  Ochsner recommended Plaintiff for reappointment during the 2008-2009 academic year despite his awareness of Plaintiff's performance issues, because he felt that Plaintiff "also demonstrated positive teaching attributes," and "was hopeful that [Plaintiff] could improve and overcome any of the shortcomings that had been observed and reported." (*Id.*).  The Lecturer Appointment Request Form for the 2008-2009 school year indicates that during his first term at UCM, Plaintiff's teaching evaluations "show some strengths in leading class discussions and some need to manage class time more efficiently.  The latter point has been addressed in consultations and will be monitored closely in the upcoming academic year." (Defs' Mot., Exh. G, DEF 0237-0238).  Based on Ochsner's recommendation, Plaintiff was reappointed for the 2008-2009 academic year.  (Ochsner Decl., ¶6).  On June 13, 2008, UCM issued a letter offering to reappoint Plaintiff as a lecturer for a limited term from August 18, 2009 to May 15, 2009.  (Defs' Mot., Exh. B-6, DEF 0239-0240).

At or around October 2008, the MWP held a general meeting at which Ochsner discussed the title of "lecturer" in comparison to the titles given at other institutions for equivalent positions.  (Ochsner Decl. ¶ 7; Zanzucchi Decl., ¶ 3).  In response to this discussion, Plaintiff submitted to

3

1  Zanzucchi a document that he had drafted which Zanzucchi described as "essentially a proposal" to

2  create a "Professor of Practice" title at the MWP.  (Zanzucchi Decl., ¶ 3).  Zanzucchi met with Plaintiff

3  to discuss the proposal, and during their meeting, Plaintiff  "appeared unfamiliar with the text in the

4  document."  (*Id.*).  Zanzucchi states that Plaintiff's lack of familiarity with the document suggested to

5  her that he had not written the proposal.  (*Id.*).  When Zanzucchi researched the issue, she discovered

6  that "much of the text [on Plaintiff's proposal] appeared to be taken verbatim from websites of other

7  academic institutions without proper attribution to the sources."  (*Id.*).  Zanzucchi brought the matter to

8  Ochsner's attention.  (Ochsner Decl., ¶ 7).  Ochsner met with Plaintiff to discuss the matter, and Plaintiff

9  "acknowledged that he should have been more explicit in citing the sources of the text and thereafter

10  submitted a substantially revised document."  (*Id.*).

11  ***Second Term (2009-2010 Academic Year)***

12     On May 26, 2009, UCM issued a letter offering to reappoint Plaintiff as a lecturer for a limited

13  term from August 17, 2009 through May 14, 2010.  (Def's Mot., Exh. B-7, DEF 0243-0244).  The

14  corresponding Lecturer Appointment Request Form contains the same language as the form for the

15  previous year, that Plaintiff's teaching evaluations "show some strengths in leading class discussions

16  and some need to manage class time more efficiently.  The latter point has been addressed in

17  consultations and will be monitored closely in the upcoming academic year."  (Defs' Mot., Exh. G, DEF

18  0240-0241).  The decision to reappoint Plaintiff was based on Ochsner's recommendation.  (DUMF

19  5:18).

20     On March 17, 2010, Ochsner conducted an observation of one of Plaintiff's classes.  (Ochsner

21  Decl., ¶ 8).  Plaintiff was provided notice of Ochsner's visit on or around March 10, 2010.  (*Id.*).

22  Ochsner recalls that Plaintiff arrived five minutes late, and approximately one quarter of the students

23  arrived after Plaintiff, which signaled to Ochsner that Plaintiff's class generally began later than

24  scheduled.  (*Id.*).  Ochsner additionally states that Plaintiff's "instruction wandered, appeared

25  unorganized, and was awkwardly fragmented," and that "few students participated in the class

4

discussion." (*Id.*).  Ochsner's report of his observation, which he prepared shortly after the observation occurred, states that "despite (or perhaps because of) [the] digressive discourse, [Plaintiff] did appear to keep the [students'] attention and occasionally linked some general points about language, literature, and culture to practical matters about effective writing." (Defs' Mot., Exh B-16, DEF 0001-0002) (true and correct copy of Ochsner's report on his observation in Plaintiff's classroom).

At an unknown time during the 2009-2010 academic year, Plaintiff approached Ochsner about submitting a grant proposal to the Pacific Rim Research Foundation. (Ochsner Decl., ¶ 9).  Ochsner told Plaintiff that he "may be willing to sponsor a grant proposal." (*Id.*).  UCM policy prohibits lecturers, such as Plaintiff, from unilaterally submitting grant proposals on behalf of UCM. (DUMF 6:26; Ochsner Decl., ¶ 9).  A Senate Faculty member, such as Ochsner, must serve as the "Primary Investigator," who then reviews, endorses, and submits the grant proposal. (Ochsner Decl., ¶ 9).  In May 2010, Ochsner received a notice from the Pacific Rim Research Foundation's review board stating that they had reviewed his grant submission. (*Id.*).  Ochsner was surprised, as he "was unaware that such a proposal had been submitted." (*Id.*).  He subsequently discovered that Plaintiff had submitted the grant proposal, listing Ochsner as the Primary Investigator. (*Id.*).  Ochsner arranged for the proposal to be withdrawn, and emailed Plaintiff that he had done so because he sought to "avoid a precedent for having someone submit a grant in the future with the expectation that I'll sponsor it regardless of protocol." (*Id.*; Defs' Mot., Exh. B-17, DEF 0003).  Plaintiff responded with an email that read "Thanks Robert for pulling my 'behind' out of the fire." (JSUMF 2:27; Ochsner Decl., ¶ 9).

### ***Third Term (2010-2011 Academic Year)***

In June 2010, Ochsner recommended Plaintiff for reappointment. (Ochsner Decl., ¶ 11). Ochsner states that although he "continued to harbor concerns regarding [Plaintiff's] job performance," he "remained hopeful that [Plaintiff] would improve." (*Id.*).  Plaintiff was sent an offer letter on June 10, 2010 informing him of reappointment. (*Id.*; Defs' Mot., Exh. B, DEF 0251-0252).  Unlike the first three offer letters, the fourth letter states that the appointment is "temporary and self-terminating," and

that UCM is "not obligated to extend or renew the appointment." (*Compare* Defs' Mot., Exh. B-3, DEF

0234-0235, Defs' Mot., Exh. B-6., DEF 0239-0240, *and* Defs' Mot., Exh. B-7, DEF 0243-0244, *with*

Defs' Mot., Exh. B-10, DEF 0251-0252).  According to Ochsner, "[t]his language was especially

relevant due to the unpredictable nature of the budget at the time." (Ochsner Decl., ¶ 9).  Additionally,

the offer letter states that Plaintiff was assigned to teach two CORE 1[2] courses in the Fall 2010 semester.

(DUMF 7:34; Defs' Mot., Exh. B-10, DEF 0251-0252).

At some time in August 2010, the first meeting for CORE 1 instructors was held.  (DUMF 8:37;

Defs' Mot., Exh. S, Declaration of Tom Hothem ("Hothem Decl."), ¶ 4).  Hothem was responsible for

overseeing and administering the CORE 1 program.  (DUMF 8:35; Hothem Decl., ¶ 1).  CORE 1

instructors, such as Plaintiff, were required to attend one of the two weekly lectures with students.

(DUMF 8:39; Hothem Decl., ¶ 4).  On September 21, 2010, Hothem emailed Plaintiff, noting that

Plaintiff had missed two lectures and two instructor meetings.  (DUMF 8:41; Hothem Decl., ¶ 5).

Hothem reminded Plaintiff that attending the lectures was required under Plaintiff's teaching agreement.

(DUMF 9:42, 44; Hothem Decl., ¶¶ 5, 6).  Plaintiff continued to miss mandatory meetings throughout

the Fall 2010 semester.  (DUMF 9:45; Hothem Decl., ¶ 6).  On September 27, 2010, Hothem notified

Plaintiff through email that attendance at CORE lectures was required and that failure to attend lectures

"necessarily factor[s] into reappointment decisions" for the 2011-2012 academic year.  (DUMF 9:47;

Hothem Decl. ¶6).  Hothem told Plaintiff that "it was important that the attendance issue be resolved,"

and that he wanted to clarify the lecture attendance requirements.  (Hothem Decl., ¶ 6).  Plaintiff

responded to Hothem in an email, "got it." (*Id.*).  However, Plaintiff continued to miss lectures and

instructor meetings.  (*Id.*).  According to Hothem, Plaintiff missed five out of the eight CORE instructor

meetings, six out of fourteen CORE lectures, and was late for five of the eight lectures he attended.  (*Id.*,

¶¶ 6-7).  Hothem states that another lecturer had a poor attendance record during the Fall 2010 semester,

---

[2] CORE 1 is "a general education class within the MWP that emphasized writing, quantitative reasoning, and critical reasoning."  (Doc. 46, at 5).

1   but that this lecturer had a serious health condition that made it difficult for her to attend the meetings.

2   (*Id.*, ¶ 8).

3         Hothem related Plaintiff's poor attendance record to Ochsner.  (*Id.*, ¶ 7).  Thus, Ochsner was

4   aware that Plaintiff was absent from these lectures and meeting, despite being informed that his

5   attendance was required.  (Ochsner Decl., ¶ 13).  Additionally, Ochsner had received complaints from

6   some of Plaintiff's students that Plaintiff's classes consistently started late and ended early.  (*Id.*, ¶ 14).

7   Ochsner and Plaintiff met in January 2011 to discuss the performance problems.  (DUMF 10:52;

8   Ochsner Decl., ¶ 14).  During their meeting, Ochsner admonished Plaintiff for his poor attendance

9   record and informed him that his performance problems "would be factored into [Ochsner's]

10  consideration of [Plaintiff's] reappointment for the following year."  (Ochsner Decl., ¶ 14).  Moreover,

11  Ochsner discussed with Plaintiff his concern about the recurring grade appeal requests that several

12  students had submitted.  (*Id.*).  In particular, Ochsner was concerned that Plaintiff appeared willing to

13  give a passing grade to a student who had only attended seven classes over the course of a semester.

14  (*Id.*).  Ochsner sent Plaintiff an email to memorialize the discussion.  (*Id.*; Defs' Mot., Exh. K DEF

15  0004).  The email ends with the following: "While I enjoy working with you and value your

16  contributions to the MWP, I nevertheless must insist that you convene class on time and attend

17  professionally to all your other teaching responsibilities."  (Defs' Mot., Exh. K, DEF 0004).

18        At some time in the Spring 2011 semester, Ochsner received a memorandum from UCM's

19  Director of Operations that the MWP had a $600,000 budget deficit.  (Ochsner Decl., ¶ 16).  In May

20  2011, Ochsner met with Zanzuchchi, and the two "created a chart ranking Lecturers based on factors

21  such as class enrollment and [their] assessment of each Lecturer's job performance."  (*Id.*).  Plaintiff was

22  one of the eleven lecturers that Ochsner and Zanzucchi identified as being "vulnerable to non-

23  reappointment due to the budget deficit."  (*Id.*).  On May 31, 2011, Ochsner advised Plaintiff and the

24  other ten lecturers that they would not be reappointed during the following academic year on account of

25  the budget shortfall.  (*Id.*).  The notification sent to these eleven individuals also informed them that they

1   might be reappointed if the budget situation were to be resolved.  (*Id.*).

2        At some time around June 2, 2011, Ochsner drafted a letter of recommendation for Plaintiff, at

3   Plaintiff's request.  (*Id.*; Defs' Mot., Exh. L, DEF 0450).   Ochsner states that he drafted this letter

4   before he received the Academic Review Committee's ("ARC") assessment of Plaintiff's portfolio, and

5   before he himself conducted a reappointment review of Plaintiff's performance.  (Ochsner Decl., ¶ 17).

6   The ARC scored Plaintiff's portfolio with a two, which suggests that Plaintiff "needs significant

7   improvement."  (*Id.*, ¶ 19; Defs' Mot, Exh. N, DEF 0445-0447).   The ARC's assessment also

8   highlighted a "noticeable lack of readability," "a few too many sentence structure errors," and contains

9   suggestions for how Plaintiff can improve his curriculum and presentation.  (Defs' Mot., Exh. N, DEF

10  0445-0447).   Moreover, the ARC's report suggested that Plaintiff meet with an ARC member to go over

11  the requirements "for future portfolios" that he might submit for review.  (*Id.*)

12       After Ochsner received the ARC assessment of Plaintiff's portfolio, he conducted the Annual

13  Appointment Review of Plaintiff's performance.  (Ochsner Decl., ¶ 19).  In completing this review,

14  Ochsner considered the ARC's assessment, a review of Plaintiff's attendance over the year, and student

15  course evaluations, which he states, "showed a declining trend."  (*Id.*).  Ochsner states that in preparing

16  these reviews for third-year lecturers such as Plaintiff, he uses a 10-point scoring system under which a

17  score of five or lower results in a non-reappointment.  (*Id.*).  Under this criteria, Ochsner scored Plaintiff

18  a three.  (*Id.*).  Ochsner also prepared a "case analysis" that memorialized his review of Plaintiff on June

19  26, 2011.  (*Id.*; Defs' Mot., Exh. O, DEF 0008-0009).

20       In addition to Plaintiff, two other lecturers also received three out of ten on their annual

21  appointment reviews.  (Ochsner Decl., ¶ 19).  These two lecturers are Caucasian.  (*Id.*, ¶ 20).  One of

22  these lecturers was not reappointed to the MWP, but secured a part-time, non-teaching position in

23  another department of UCM before being notified of non-reappointment.  (*Id.*).  The other lecturer had a

24  disability that interfered with teaching performance.  (*Id.*).  This lecturer grieved the non-reappointment

25  decision, and received a provisional appointment as part of a reasonable accommodation process.  (*Id.*).

In early June 2011, Ochsner learned that the budget deficit had been "averted," and that eight of the eleven lecturers who had initially received notices of non-reappointment would be reappointed.  (*Id.*, ¶ 21).  Ochsner notified Plaintiff on June 15, 2011 that he would not be reappointed for the 2010-2011 academic year because of his teaching performance.  (*Id.*).  Plaintiff responded the next day stating that he disagreed with the decision not to reappoint him but that he would not seek reappointment.  (*Id.*).  Moreover, Plaintiff did not file a grievance with UCM's grievance officer, which he was permitted to do under the MOU governing the MWP's contracts with lecturers.  (DUMF 12:62-63).

On August 26, 2011, Plaintiff sent Ochsner an email that read, "Hey Robert it is a bit disturbing that everyone was brought back except the Black Guy. Hmmm."  (Ochsner Decl., ¶ 22).  Ochsner states that the only other communication he received from Plaintiff before this August 26, 2011 email was a short email in which Plaintiff requested to be considered for a part-time position.  (*Id.*).

On August 27, 2011, Plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC), alleging racial discrimination.  (Defs' Mot, Exh. D, DEF 0492-0495 (EEOC intake questionnaire).  Subsequently, Ochsner was contacted by Joanne Dunlap, UCM's Assistant Vice Chancellor for Human Resources, who was responsible for preparing UCM's response to the EEOC.  (Ochsner Decl., ¶ 23).  Ochsner then provided Dunlap "with a statement addressing the various allegations in [Plaintiff's] EEOC complaint."  (*Id.*).  Ochsner maintains that the statements he made to Dunlap were true, based on his observations of Plaintiff, reports he had received about Plaintiff from MWP administrators, and student course evaluations and complaints.  (*Id.*).  UCM submitted its response to the EEOC's investigation on November 30, 2011.  (Defs' Mot., Exh. D, DEF 0500).  On February 4, 2013, the EEOC notified Plaintiff that it had conducted an investigation of his allegations and provided him with a Right to Sue letter.  (*Id.*, DEF 0460-0462).

## II. PROCEDURAL HISTORY

Plaintiff commenced this action, *pro se*, by filing his original complaint with this Court on May 13, 2013.  (Doc. 1).  Plaintiff named "Regents, University of California, University of California-

1    Merced, School of the Humanities, Merritt Writing Program" as defendants in this action.  (*Id.*).  On

2    July 2, 2013, the Magistrate Judge screened Plaintiff's complaint, dismissing it in part with prejudice

3    and, in part without prejudice, and directing Plaintiff to file an amended complaint within thirty days

4    curing the deficiencies identified in the order.  (Doc. 7).[3]

5          On July 31, 2013, Plaintiff filed his First Amended Complaint ("FAC"), adding Mark Yudof,

6    Steve Kang, Sam Traina, Robert Ochsner, and Does 1-10 as defendants.  (Doc. 8).  The Magistrate

7    Judge screened the FAC on September 6, 2013 and provided Plaintiff with the opportunity to cure the

8    deficiencies identified in the order, or in the alternative, to notify the Court that he would be agreeable to

9    proceeding on the claims that the Magistrate Judge had deemed cognizable.  (Doc. 9).

10         On October 7, 2013, Plaintiff filed his Second Amended Complaint ("SAC"), adding Tom

11   Hothem and Anne Zanzucchi as defendants.  (Doc. 10).  The SAC is the operative complaint in this

12   matter.[4]  Following another round of screening by the Magistrate Judge (Doc. 11), the United States

13   Marshals Service was directed to serve the SAC on Defendants.  (Doc. 14).  On February 24, 2014

14   Defendants Moved to Dismiss the SAC.  (Doc. 16).  The Magistrate Judge issued Findings and

15   Recommendations on Defendants' Motion to Dismiss (Doc. 27), which this Court adopted in part,

16   determining the only cognizable claims in the SAC to be (1) Plaintiff's defamation claim against

17   individual defendants Ochsner, Hothem, and Zanzucchi; and (2) Plaintiff's Title VII employment

18   discrimination claim against the Regents.[5]  (Doc. 31) (Amended Order Adopting in Part Findings and

19   Recommendations).

20   _____

21   [3] With regard to Plaintiff's claim under Title VII, the Magistrate Judge noted that "Plaintiff does not identify a theory of
     discrimination under Title VII," and considered two theories: hostile work environment and wrongful termination.  (*Id.*, at 9-
     10).  The Magistrate Judge determined that Plaintiff had satisfied the screening requirements for both theories.  (*Id.*).

22   [4] Plaintiff did not file his Third Amended Complaint ("TAC") in a timely manner.  (*See* Doc. 35).  Accordingly, the Court
     issued an order striking the TAC and directing that the case proceed only with the causes of action found cognizable in the
     Court's order adopting the Findings and Recommendations regarding the SAC.  (*Id.*).

23   [5] It appears that the Magistrate Judge's finding in the first screening order that Plaintiff had satisfied the screening
     requirements for his Title VII claim under <u>both</u> hostile work environment and wrongful termination remains in place.  (Doc.

24   7, at 9-10).  The screening order for the SAC, which was adopted in full (*see* Doc. 12), notes that the Court previously found
     that Plaintiff had stated cognizable claims for hostile work environment and wrongful termination, and permitted Plaintiff to

25   proceed with his Title VII claim.  (Doc. 11, at 5).  Moreover, Defendants' Motion to Dismiss did not seek dismissal of
     Plaintiff's Title VII claims.  (*See* Doc. 16, at 12).

1       On June 26, 2015, Defendants filed the pending Motion for Summary Judgment.  (Doc. 46).  The

2   Motion seeks summary adjudication, or in the alternative, partial summary adjudication on Plaintiff's

3   defamation claim and his racial discrimination claim under Title VII.[6]  (*Id.*).  On July 16, 2015, Plaintiff

4   filed "Declaration of Loren Lamonte' Qualls, *Pro Se*, Requesting Continuance of Hearing to Provide

5   Additional Time to Respond to Defendants' Motion for Summary Judgment."  (Doc. 49).  The Court

6   construed this as a Fed. R. Civ. Pro. 56(d) motion to extend time to respond to Defendants' summary

7   judgment motion.  (Doc. 52).  Defendants filed their opposition on July 21, 2015 (Doc. 50), and Plaintiff

8   filed another "Declaration" in support of his request on July 22, 2015 (Doc. 51).  Citing Plaintiff's

9   unreasonable delays and his failure to demonstrate good cause or any excusable neglect that would

10  warrant extension, the Court denied Plaintiff's motion for extension of time on July 24, 2015.  (Doc. 52).

11  Thus, as Plaintiff failed to file an opposition to Defendants' Motion, the Court will decide the Motion

12  solely based on the evidence that Defendants submitted.[7]  However, an unopposed motion for summary

13  judgment may be granted only if the movant's papers are themselves sufficient to support the motion and

14  do not on their face reveal a genuine issue of material fact.  *See Carmen v. San Francisco Unified*

15  *School District*, 237 F.3d 1026, 1029 (9th Cir. 2001).

16                   **III. <u>STANDARD OF DECISION</u>**

17      Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any

18  affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is

19  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that may affect the

20  outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

21  (1986).  A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict

22

---

23  [6] Defendant's Motion makes no mention of Plaintiff's hostile work environment claim, which as noted above, appears to remain in this case.  The Court expresses no opinion as to the continued viability of any such claim.

24  [7] In some instances, a verified complaint can serve as an opposing affidavit.  *See Keenan v. Hall*, 83 F.3d 1083, 1090 n. 1 (9th Cir. 1996) (quoting *McElyea v.* Babbitt, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curium), *amended by* 135 F.3d 1318 (9th Cir. 1998); *see also Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir 1985) (the Court should "treat the opposing

25  party's papers more indulgently than the moving party's papers.").  However, because Plaintiff's SAC has not been sworn to or properly verified, the Court will not rely on it in ruling on the pending Motion.  Fed. R. Civ. P. 56(e).

1  in favor of the nonmoving party." *Id.* The Court's inquiry is "whether the evidence presents a sufficient

2  disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as

3  a matter of law." *Id.* at 251–52.

4  The party seeking summary judgment "always bears the initial responsibility of informing the

5  district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

6  answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

7  demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317,

8  323 (1986) (internal quotation marks omitted).  The exact nature of this responsibility, however, varies

9  depending on whether the issue on which summary judgment is sought is one in which the movant or the

10  nonmoving party carries the ultimate burden of proof.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d

11  978, 984 (9th Cir. 2007); *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007).  If the movant

12  will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable

13  trier of fact could find other than for the moving party."  *Soremekun*, 509 F.3d at 984.  In contrast, if the

14  nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out

15  that there is an absence of evidence to support the nonmoving party's case."  *Id.* (citing *Celotex*, 477

16  U.S. at 323).

17  If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in

18  its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a

19  jury could find in [its] favor."  *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in

20  original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard.  *Id.* at 929;

21  *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the

22  moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that

23  there is some metaphysical doubt as to the material facts.") (citation omitted).  "Where the record as a

24  whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue

25  for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S.

253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. That remains the province of the jury or fact finder. *See Anderson*, 477 U.S. at 255. Instead, "[t]he evidence of the [non-moving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* For employment discrimination cases, the Ninth Circuit has set a "high standard for the granting of summary judgment . . . . 'because the ultimate question is one that can only be resolved through a 'searching inquiry'—one that is most appropriately conducted by the factfinder, upon a full record.' " *Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406, 1410 (9th Cir.1996), quoting *Lam v. University of Hawaii,* 40 F.3d 1551, 1563 (9th Cir.1994). At this stage, "[t]he amount of evidence [Plaintiff] must produce is 'very little' . . . so long as it is more than 'purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars." *Peterson v. Hewlett–Packard Co*., 358 F.3d 599, 603 (9th Cir.2004) (internal citations omitted).

## IV. <u>ANALYSIS</u>

Defendants' Motion seeks summary judgment on Plaintiff's claims of race discrimination in violation of Title VII and his claim of defamation under California state law. (Doc. 46).

**A.    Title VII Claim**

The adjudication of Plaintiff's Title VII claim is governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As applied in this case, under *McDonnell Douglas*, Defendants have the initial burden of demonstrating that Plaintiff cannot make a prima facie showing that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson*, 358 F.3d at 603.

If Defendants cannot meet this burden, and Plaintiff can demonstrate a prima facie case, there is

13

1    a rebuttable "presumption that [Defendants] unlawfully discriminated against [Plaintiff]." *Texas Dep't*

2    *of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981).  Here, Defendants must then "articulate a

3    legitimate, nondiscriminatory reason for the plaintiff's rejection." *Warren v. City of Carlsbad*, 58 F.3d

4    439, 442 (9th Cir. 1995).  "To accomplish this, [Defendants] must clearly set forth, through the

5    introduction of admissible evidence, the reasons for [Plaintiff]'s rejection.  The explanation provided

6    must be legally sufficient to justify a judgment for [Defendants]." *Burdine,* 450 U.S. at 255.

7            If Defendants carry this burden of production, Plaintiff must demonstrate that "the proffered

8    reason was not the true reason for the employment decision." *Id.*  Specifically, he must show that

9    Defendants' "articulated reason is a pretext for unlawful discrimination by "either directly persuading

10   the court that a discriminatory reason more likely motivated the employer or indirectly by showing that

11   the employer's proffered explanation is unworthy of credence." *Chuang v. Univ. of Cal. Davis*, 225

12   F.3d 1115, 1124 (9th Cir. 2000) (quoting *Burdine*, 450 U.S. at 256).  "Plaintiff can survive summary

13   judgment without producing any evidence of discrimination beyond that constituting the prima facie

14   case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's

15   proffered reasons." *Barefield v. Bd. of Trustees of CA State Univ., Bakersfield*, 500 F. Supp. 2d 1244,

16   1259-60 (E.D. Cal. 2007) *on reconsideration sub nom. Barefield v. Bd. of Trustees of Cal. State Univ.*,

17   No. CIVF05-0633 AWI TAG, 2007 WL 3239288 (E.D. Cal. Nov. 2, 2007) (citing *Chuang*, 225 F.3d at

18   1124).

19           Defendants, in the pending Motion, argue that (1) Plaintiff cannot establish a prima facie case of

20   discrimination because he cannot demonstrate that he performed his job satisfactorily and has no

21   evidence that actions were taken on account of his race; (2) Defendants had legitimate non-

22   discriminatory reasons for not-reappointing Plaintiff; and (3) Plaintiff cannot establish that Defendants'

23   reasons for not-reappointing him were pre-textual.  (Doc. 46).

24           **1.   <u>Prima Facie Case</u>**

25           Plaintiff, as an African-American, is a member of a protected class.  (SUMF 2:1).  Moreover, the

Regents' decision not to reappoint him as a lecturer in 2011 is indisputably an "adverse employment action," for the purpose of establishing a prima face case of employment discrimination.  *Chuang*, 225 F.3d at 1126 (in the context of a race-discrimination case, defining "adverse employment action" as one that "materially affect[s] the compensation, terms, conditions, or privileges . . . of employment."); *see also Ray v. Henderson*, 217 F.3d 1234, 1240-44 (9th Cir. 2000) (noting that the Ninth Circuit "define[s] adverse employment action broadly," and has "found that a wide array of disadvantageous changes in the workplace constitute adverse employment actions," including a lateral transfer and the dissemination of an unfavorable job reference).

Defendants argue that Plaintiff cannot satisfy the second prima facie requirement under *McDonnell Douglas*—that he performed his job satisfactorily.  (Doc. 46, at 15-16).  In support of this contention, they have submitted voluminous amounts of evidence that, if believed by the trier of fact, would tend to show that Plaintiff performed his job poorly.  According to Defendants, issues regarding Plaintiff's poor performance surfaced as early as March 3, 2008, when Zanzucchi observed one of Plaintiff's class sessions.  (DUMF 3:11-12; 4:13-15).  Zanzucchi observed that Plaintiff "spent a considerable amount of class time showing YouTube clips that had little to do with the  course material," and recalls being "struck by the palpable lack of student participation and interaction throughout the class session." (Zanzucchi Decl., ¶ 2).  Zanzucchi found that Plaintiff's instruction was "disorganized and unfocused," and she grew concerned about his "effectiveness in providing fundamental aspects of instruction."  (*Id.*).

Ochsner, Plaintiff's direct supervisor who recommended him for reappointment in each of the following three years after he was hired, was also aware of the alleged deficiencies in Plaintiff's performance, but states that he had hoped that Plaintiff would improve.  (DUMF 4:16; Ochsner Decl., ¶ 5).  According to Ochsner, Plaintiff improperly submitted a grant proposal in violation of UCM's policy that listed Ochsner as the primary investigator, without Ochsner's knowledge or approval.  (DUMF 6:24-26; Ochsner Decl., ¶ 9).  When Ochsner withdrew the grant proposal, Plaintiff sent Ochsner an

1  email that read "Thanks Robert for pulling my 'behind' out of the fire."  (JSUMF 2:27; Ochsner Decl., ¶

2  9).

3       Throughout the Fall 2010 semester, Hothem, who was responsible for overseeing UCM's CORE

4  1 program, sent Plaintiff emails noting that Plaintiff had missed lectures and instructor meetings, which

5  were mandatory under Plaintiff's contracted teaching assignment.  (DUMF 8:38-41, 9:42; Hothem

6  Decl., ¶¶ 5-7).  Despite being warned by Hothem, Plaintiff continued to miss more CORE lectures and

7  meetings.  (DUMF 9:44-47, 10:48-50; Hothem Decl., ¶ 9).

8       Moreover, the ARC's independent review of Plaintiff's third-year portfolio indicated that he had

9  performed inadequately.  (DUMF 10:54, 11:56; Ochsner Decl., ¶¶ 18, 19).  Ochsner's own "case

10  analysis" of the ARC assessment of Plaintiff, dated June 26, 2011, indicates that Plaintiff demonstrated

11  "inattention to student inquiries, unclear organization of class activities, assignment of course grades in a

12  seemingly capricious manner, tendency to lecture on topics unrelated to course objectives, and recurring

13  absence from classes."  (Defs' Mot., Exh. O, DEF 0008-0009).  This document describes Plaintiff as a

14  "habitual multi-tasker" who "exhibits the related consequences of carelessness, especially and most

15  disturbingly in his own writing, which too often reveals fundamental problems of incorrect usage, lack

16  of coherence, and pretentions if not meaningless diction."  (*Id.*).  Ochsner's analysis notes that while

17  Plaintiff "consistently fulfills the narrowly professional terms of his lecturer contract by teaching five

18  courses annually, submitting his course grades on time, and serving on MWP committees," Plaintiff has,

19  in other respects, "failed to demonstrate excellence in teaching or sufficient promise to achieve a

20  standard of excellence, and that "the MWP cannot rehire someone whose own use of academic discourse

21  is profoundly flawed."  (*Id.*).

22       Notwithstanding this evidence, the Court cannot ignore the letter of recommendation written by

23  Ochsner for Plaintiff, dated June 2, 2011, that <u>Defendants</u> submitted in support of their Motion.  (Defs'

24  Mot., Exh. L, DEF 0450).  This letter reads in its entirety as follows:

25       To whom it may concern:

Primarily for budgetary reasons and secondarily for related programmatic adjustments, Dr. Loren Qualls was not rehired at UC Merced (UCM) to teach in the Merritt Writing Program for Academic Year 2011-12.  This decision to terminate Dr. Qualls' employment does not reflect a negative judgment of his overall teaching or service at UCM.

In his three years at UCM, Dr. Qualls has taught several writing courses, mostly for freshmen, including an especially challenging general education course (Core 1) that requires instruction in quantitative reasoning.  In my observations of his teaching, review of his peers' observations, and individual discussions with Dr. Qualls about teaching, I would characterize him as an experienced instructor who aims to engage students in class discussion through Socratic questioning of their basic ideas.  He also multi-tasks effectively, supplemented by his considerable expertise in using instructional technology.  The latter has been thoroughly demonstrated in a summary assessment that he prepared for me to show how Ipads can enhance writing instruction.

In sum, I want to stress that Dr. Qualls has consistently and professionally fulfilled all his responsibilities for teaching and service as specified in his lecturer contract.  In serving as a reference for Dr. Loren Qualls, I will be pleased to elaborate further in response to questions that a prospective employer might have about his strengths as a teacher and related strengths as a valued colleague.

Sincerely,

Robert Ochsner, Director
Merritt Writing Program.

(*Id.*).  Defendants argue that the letter is "neutral," and explain that Ochsner wrote the letter at Plaintiff's behest, before he received the ARC's assessment of Plaintiff, and before he conducted his own reappointment evaluation.  (Doc. 46, at 17-18).  Nevertheless, because the Court is bound to view the evidence in the light most favorable to Plaintiff, the Court must find that this letter presents a genuine issue of material fact as to whether Plaintiff performed his job satisfactorily or not.  *See Cornwell v. Electra Central Credit Union,* 439 F.3d 1018, 1027 (9th Cir. 2006); *see also Liu v. Colvin*, No. 11-CV-6120 JSC, 2013 WL 1729800, at *5 (N.D. Cal. Apr. 22, 2013) ("Plaintiff's 'successful' employment evaluations create at least a dispute as to whether she was performing her job satisfactorily.").  Although there is indeed considerable evidence of Plaintiff's alleged deficient job performance, the Court does not weigh the evidence or determine the truth of the matter at this time.  *Glenn K. Jackson Inc. v. Roe,* 273 F.3d 1192, 1196 (9th Cir. 2001).  Ochsner's letter, which a reasonable juror could find to describe

1   Plaintiff as performing his job competently, is inconsistent with the other evidence that Defendants have

2   submitted that tends to show that Plaintiff performed his job poorly, and thus creates a genuine issue for

3   trial.  *See id.*  Notably, Ochsner's letter identifies the budget as the primary reason that Plaintiff was not

4   re-appointed, and moreover explicitly states that the "decision to terminate [Plaintiff's] employment

5   does not reflect a negative judgment of his overall teaching or service at UCM," which cuts against

6   Defendants' claim that he was not re-appointed because he did not perform his job in a satisfactory

7   manner.  The Court's finding that this letter creates a genuine issue of material fact is supported by the

8   Ninth Circuit's holding that a plaintiff's burden in establishing a prima facie case of discrimination is

9   "minimal."  *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 (9th Cir. 2005); *Aragon v. Republic*

10  *Silver State Disposal Inc.*, 292 F.3d 654, 660 (9th Cir. 2002).

11          Therefore, because there is a dispute as to this factual issue, and because at summary judgment,

12  "[t]he evidence of the non-movant is to be believed," the Court will assume that Plaintiff performed his

13  job satisfactorily.  *See Anderson*, 477 U.S. at 255.  With this assumption, the Court proceeds to the final

14  prong of the *McDonnell Douglas* framework and considers whether there is enough evidence for a juror

15  to find that "similarly situated individuals outside [Plaintiff's] protected class were treated more

16  favorably, or other circumstances surrounding the adverse employment action give rise to an inference

17  of discrimination."  *Peterson*, 358 F.3d at 603.  However, Defendants' Motion fails to address this

18  component of *McDonnell Douglas*, as it merely argues that "Plaintiff has no evidence that any actions

19  were taken because of his race."  (Doc. 46, at 15).  In support of their argument, Defendants allege that

20  there is "undisputed evidence" that a Caucasian lecturer was not reappointed to the MWP, and that one

21  lecturer was reappointed notwithstanding her poor record of attendance to CORE meetings and lectures

22  because her absences were the result of a serious medical condition.  (*Id.*).  At summary judgment, this

23  evidence is insufficient for Defendants to meet their burden as to the similarly situated prima facie

24  requirement.  Because there are material disputes concerning Plaintiff's performance (the second prima

25  facie prong), the Court must view that evidence in a light most favorable to Plaintiff and must assume

1   for purposes of summary judgment that Plaintiff performed in a satisfactory manner.  The comparators

2   Defendants offer are not similarly situated to Plaintiffs because they were poor performers.  Therefore,

3   Defendants fail to demonstrate that Plaintiff cannot show that similarly situated individuals outside of

4   his class were treated more favorably.  *See Anderson*, 477 U.S. at 255.  In other words, the Court is

5   unable to determine as a matter of law that Plaintiff cannot establish a prima facie case.  Consequently,

6   the Court cannot find that Defendants have met their burden of demonstrating that there are no disputed

7   material facts as to Plaintiff's prima facie case under *McDonnell Douglas*.   *See id.*

8            **2.         Legitimate Non-Discriminatory Reason**

9            The Court additionally finds that Ochsner's letter precludes Defendants from establishing, at

10  summary judgment, that they had a legitimate non-discriminatory reason for not re-appointing Plaintiff.

11  As discussed above, at the second stage of the *McDonnell Douglas* framework, Defendants have the

12  burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's rejection that would be

13  "legally sufficient to justify a judgment for [Defendants]."  *Burdine*, 450 U.S. at 225.  For the same

14  reasons Defendants cannot show it is undisputed that Plaintiff did not perform his job satisfactorily, they

15  cannot show that it is undisputed that they had a legitimate nondiscriminatory reason for their failure to

16  re-appoint him in 2011.  This is because the evidence that Defendants proffer tending to show that

17  Plaintiff's performance was deficient is the same evidence they provide to demonstrate that they had a

18  legitimate reason for not re-appointing him that was not related to his status as an African American.

19  (Doc. 46, at 15-17).  Because Ochsner's recommendation letter creates a material dispute as to

20  Plaintiff's performance, the Court cannot find as a matter of law that Defendants have established a

21  legitimate nondiscriminatory reason for their failure to reappoint Plaintiff.  For purposes of summary

22  judgment, the *McDonnell Douglas* analysis ends here, and Defendants' Motion for Summary Judgment

23  on this claim must be denied.

24          **3.         Pretext**

25          As there are genuine disputes of material facts as to Plaintiff's prima facie case and Defendants'

1    legitimate non-discriminatory reason for not re-appointing him, the Court need not address whether

2    there was pretext at this time.

3        **4.    Conclusion re: Title VII Claim.**

4        Defendants have failed to meet their burden of showing "the absence of a genuine issue of

5    material fact." *See Celotex*, 477 U.S. at 323.  The evidence that Defendants submitted in support of their

6    Motion contains conflicting accounts of Plaintiff's job performance, which at this stage, is enough for

7    Plaintiff to survive summary judgment with regard to his Title VII discrimination claim.  *Schnidrig*, 80

8    F.3d at 1410.  Accordingly, the Motion for Summary Judgment on Plaintiff's Title VII race

9    discrimination claim is DENIED.

10   **B.    Defamation**

11       Defendants Ochsner, Zanzucchi, and Hothem seek summary judgment on Plaintiff's defamation

12   claim, arguing that (1) Plaintiff's defamation allegations are time-barred, (2) the alleged defamatory

13   statements made by Zanzucchi and Ochsner were privileged and/or true; and (3) Hothem did not make

14   or publish any defamatory statements.  (Doc. 46, at 11-12).

15       Under California law, the elements of a defamation claim are: "(a) a publication that is (b) false,

16   (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special

17   damage.'" *Taus v. Loftus,* 40 Cal.4th 683, 720 (2007).  "Publication" requires some communication,

18   whether oral or written.  Cal. Civ. Code §§ 45, 46.  Moreover, California law imposes a one-year statute

19   of limitations on defamation claims.  *Id.* § 340(c).  Therefore, defamation claims must be filed within

20   one year of the alleged offending conduct.  *See Seid v. Pac. Bell, Inc*., 635 F. Supp. 906, 910-11 (S.D.

21   Cal. 1985).

22       Because Plaintiff filed this suit on May 3, 2013, his defamation claim is limited to defamatory

23   statements made on or after May 3, 2012.  *See id.*  The only alleged defamatory statements identified by

24   Plaintiff in the record occurred between 2008 and 2011.  Specifically, Zanzucchi's statement to Ochsner

25   that accused Plaintiff of plagiarism occurred in 2008.  (Zanzucchi Decl., ¶ 3).  Hothem's conversation

with Plaintiff about hip-hop where Hothem allegedly referred to Plaintiff as "Jay-Z" or "Snoop" occurred in Fall 2010. (Defs' Mot., Exh. B, Plaintiff's Depo. 266:22, 267-24). Defendants' alleged "false communication of evaluation and portfolio" occurred in May 2011 (Def's Mot., Exh. C, at 10). Finally, Ochsner's comments to Joanne Dunlap, the Assistant Vice Chancellor for Human Resources at UCM, must have occurred before November 30, 2011, because these comments were in a written response that Ms. Dunlap sent to the EEOC on that date. (Def's Mot., Exh. D, DEF 0509-0514). Therefore, Defendant's assertion that "all of the alleged defamatory statements occurred long before the limitations period" is correct. (Doc. 46, at 11). As Plaintiff is barred as a matter of law from pursuing his defamation claims, the Court need not address Defendants' remaining arguments that the alleged statements were true, privileged, or that they did not occur. The Court will thus GRANT Defendants' Motion for Summary Judgement on Plaintiff's defamation claim.

## V. <u>CONCLUSION AND ORDERS</u>

For the foregoing reasons, the Court DENIES Defendants' Motion for Summary Judgment with respect to Plaintiff's Title VII claim, but GRANTS the Motion on Plaintiff's defamation claim.

IT IS SO ORDERED.

Dated:   __September 23, 2015__          ____/s/ Lawrence J. O'Neill____
                                        UNITED STATES DISTRICT JUDGE